UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JUDITH M. SMELL,                    :
                                    :
        Plaintiff                   :    No. 4:11-CV-01116
                                    :
     vs.                            :    (Complaint Filed 6/10/11)
                                    :
MICHAEL ASTRUE,                     :
COMMISSIONER OF SOCIAL              :    (Judge Munley)
SECURITY,                           :
                                    :
        Defendant                   :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Judith M. Smell's claim for social security

disability insurance benefits.

        Smell protectively filed her application for disability

insurance benefits on June 26, 2007. Tr. 19, 76 and 94.[1]  The

application was initially denied by the Bureau of Disability

Determination on January 25, 2008.[2] Tr. 77-81. On February 8,

2008, Smell requested a hearing before an administrative law

judge. Tr. 19 and 82-83.  A hearing was held before an

administrative law judge on April 9, 2009, and the administrative

_____

1. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of his Answer on August 25,
2011.

2. The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
Administration.  Tr. 78.

law judge issued a decision denying Smell's application for disability benefits on July 10, 2009. Tr. 19-67.  On August 18, 2009, Smell filed a request for review with the Appeals Council. Tr. 12-15.  After about 21 months had elapsed, the Appeals Council on May 5, 2011, concluded that there was no basis upon which to grant Smell's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Smell then filed a complaint in this court on June 10, 2011.  Supporting and opposing briefs and statements of material facts were submitted and the appeal[3] became ripe for disposition on December 16, 2011, when Smell filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Smell met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 19, 21, 111 and 116.

Smell, who was born in the United States on June 19, 1967, graduated from high school and can read, write, speak and understand the English language and perform basic mathematical

_____

3. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

functions. Tr. 29, 36-37, 76, 94, 119 and 126. During her

elementary and secondary schooling, Smell attended regular

education classes. Tr. 126. After high school Smell completed 4

years of college in 1989 obtaining a degree in political science

at York College, York, Pennsylvania. Tr. 36. Smell also obtained

certification in handling hazardous materials. Tr. 37.

Smell although relatively young[4] has a lengthy history

of work and earnings and held several jobs which can be

considered past relevant employment.[5] A vocational expert

testified that Smell's past relevant employment consisted of

semi-skilled, light to medium work[6] as a "coordinator to the

_____

4. At the time of the administrative hearing and the ALJ's
decision, Smell was 42 and 43, respectively, and considered a
"younger individual" whose age would not seriously impact her
ability to adjust to other work. 20 C.F.R. § 404.1563(c). The
Social Security regulations state that "[t]he term younger
individual is used to denote an individual 18 through 49." 20
C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

5. Past relevant employment in the present case means work
performed by Smell during the 15 years prior to the date her
claim for disability benefits was adjudicated by the
Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

6. The terms sedentary, light and medium work are defined in the
regulations of the Social Security Administration as follows:

        (a) *Sedentary work*. Sedentary work involves lifting no
        more than 10 pounds at a time and occasionally lifting
        or carrying articles like docket files, ledgers, and
        small tools. Although a sedentary job is defined as
        one which involves sitting, a certain amount of walking
        and standing is often necessary in carrying out job
        duties. Jobs are sedentary if walking and standing are
        required occasionally and other sedentary criteria are
        met.

president [of a digital signal processing company], coordinator, and coordinator to the director of marketing . . . payroll processor [and] site supervisor [at a community college]." Tr. 62-64 and 121.

Records of the Social Security Administration reveal that Smell had earnings as follows:

| Year | Earnings |
|------|---------:|
| 1984 | $   401.16 |
| 1985 |     0.00 |
| 1986 |   496.38 |
| 1987 |  1249.23 |
| 1988 |  3480.00 |
| 1989 |  7690.96 |
| 1990 | 16041.73 |
| 1991 |  9264.67 |
| 1992 |  2400.50 |
| 1993 |  8955.00 |
| 1994 | 15482.37 |
| 1995 | 15961.88 |

---

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

20 C.F.R. § 404.1567.

4

```
1996                 5040.00
1997                20588.00
1998                21818.00
1999                15507.36
2000                21867.12
2001                10377.85
2002                10525.38
2003                16729.50
2004                30304.52
2005                31225.76
2006                 8031.31
```

Tr. 112. Smell's total earnings from 1984 through 2006 were $273,438.68. Id.

Smell claims that she became disabled on April 30, 2006, as a result of both physical and psychiatric impairments. Tr. 77, 120 and 151. The physical impairments alleged include fibromyalgia and the psychiatric impairments include depression. Id. The medical records reveal that Smell has taken several medications, including Clonazepam (Klonopin),[7] Cymbalta,[8] Gabapentin,[9] Plaquenil,[10] Hydrocodone, Kadian (morphine),

---

7. Clonazepam (Klonopin) is used to treat seizures and panic attacks. It is in a class of drugs called benzodiazepines. Side effects of this drug include headaches, muscle weakness, drowsiness, dizziness and problems with thinking or memory. Drugs.com, http://www.drugs.com/clonazepam.html (Last accessed November 9, 2012).

8. Cymbalta is used to treat major depression and general anxiety disorder. It is also used to treat the pain attributable to fibromyalgia and to treat chronic musculoskeletal pain from osteoarthritis and back injury. Side effects of this drug include headaches, trouble concentrating, memory problems, weakness, drowsiness, and loss of coordination. Drugs.com, http://www.drugs.com/cymbalta.html (Last accessed November 9, 2012).

9. Gabapentin (Neurontin) is used to treat seizures and some types of pain. Side effects of this drug include headaches, muscle weakness, drowsiness, dizziness and problems concentration

Oxycodone and Fiorinal.[11]  Tr. 164 and 336-371.  Smell has not

worked since April 30, 2007. Tr. 21, 41 and 120.

For the reasons set forth below we will remand the case

to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, we have

plenary review of all legal issues decided by the Commissioner.

See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91

(3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,

181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, our review of the

Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

to determine whether those findings are supported by "substantial

evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

Factual findings which are supported by substantial evidence must

be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,

38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported

---

and memory.  Drugs.com, http://www.drugs.com/gabapentin.html
(Last accessed November 9, 2012).

10. Plaquenil, inter alia,  is used to treat the symptoms of
rheumatoid arthritis and systemic lupus erythematosus. Side
effects include dizziness, muscle weakness, loss of balance or
coordination and headache.  Drugs.com, http://www.drugs.
com/plaquenil.html (Last accessed November 9, 2012).

11. Hydrocodone, Kadian, Oxycodone and Fiorinal are all pain
medications.  The side effects of these drugs include drowsiness
and dizziness.  Fiorinal is used to treat tension headaches.

by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706,

and "must take into account whatever in the record fairly
detracts from its weight." Universal Camera Corp. v. N.L.R.B.,
340 U.S. 474, 488 (1971).  A single piece of evidence is not
substantial evidence if the Commissioner ignores countervailing
evidence or fails to resolve a conflict created by the evidence.
Mason, 994 F.2d at 1064.  The Commissioner must indicate which
evidence was accepted, which evidence was rejected, and the
reasons for rejecting certain evidence. Johnson, 529 F.3d at 203;
Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the
decision of the Commissioner must scrutinize the record as a
whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981);
Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with

8

respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[12] (2) has an impairment that is severe or a combination of impairments that is severe,[13] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[14] (4) has the residual functional capacity to return

---

12. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

13. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

14. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems

to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will set forth some of

---

impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

15. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

the undisputed medical facts.[16] Those facts are as follows:

1. On February 14, 2006, when Smell was seen by her primary care physician, Elizabeth Perelli, M.D., in Summit Hill, Pennsylvania, she was complaining of persistent headaches. Her history was notable for headaches, myalgias, depression, anxiety, and insomnia. At work she was okay but at home, she was having problems with her husband and many stressors. Her appetite was not great, her headaches worsened if she did not take Fiorinal, and her legs and back hurt all the time. Dr. Perelli observed that Smell looked tired. There were muscle spasms in Smell's neck and back. The doctor's impression was persistent headaches and anxiety. Dr. Perelli suggested that the headaches might be a rebound response to Fiorinal. She reduced Smell's dosage to a maximum of 5 per day. For anxiety, Smell was to continue taking Cymbalta and Clonazepam. Tr. 261-262 and 248.

2. On May 24, 2006, Smell presented to Dr. Perelli complaining of not being able to sleep at night and being fatigued at about 4 p.m. She said that she could sleep if she takes something. Food was repulsive to her. She had not made an appointment with a gastroenterologist as recommended. She had many stressors at home including her husband – who had multiple sclerosis – having mood swings. Smell was feeling more anxious. She was nauseated and had lost weight. She was fatigued and felt weaker at times. She could only sleep an hour or two at a time

---

16. These facts are taken from the statements submitted by Smell and the Commissioner. Docs. 11 and 15.

and was not working at this time due to her ill feeling. Dr.
Perelli observed that Smell appeared tired, anxious and pale.
Examination was remarkable for epigastric tenderness. The doctor
assessed: (1) nausea/weight loss/epigastric tenderness for which
Smell was to see a gastroenterologist; (2) headaches for which
she was to continue Fiorinal and Axert; and (3) insomnia/anxiety
for which she was to continue Cymbalta, Atarex, and Clonazepam.
Tr. 258.

3.   Smell presented to the Emergency Department of
Miners Memorial Hospital in Carbondale, Pennsylvania on May 30,
2006 in severe distress with abdominal pain.  With treatment, she
improved and was discharged. Tr. 187-188.

4.   Smell returned to the Emergency Department of
Miners Memorial Hospital on June 1, 2006 with complaints of
abdominal pain and was admitted to the hospital.  During her two-
day stay, an esophagogastro-duodenoscopy was performed, revealing
hemorrhagic gastritis, Type II.  Discharge diagnosis was
gastritis and hemorrhage.  Secondary diagnosis was aplastic
anemia, urinary tract infection, and esophageal reflux. Tr. 198-
199.

5. On June 12, 2006, when Smell was seen in follow-up
by Dr. Perelli, they talked about her recent hospitalization,
gastrointestinal bleeding, and anemia.  Smell was getting her
strength back.  She was scheduled to see a rheumatologist later
in the week.  She was still having headaches but they had
improved. On examination, Smell appeared tired and pale.  There

was slight epigastric tenderness. Dr. Perelli's assessment was: (1) gastritis/anemia for which Smell was to continue on her current medications and follow up with her gastroenterologist; (2) myalgias for which she was to continue on her medications and see a rheumatologist; and (3) anxiety/depression for which she was to continue taking Cymbalta and Klonopin. Dr. Perelli noted that Smell had breakthrough symptoms especially with her stressors at home.

6. In follow-up with Dr. Perelli on July 10, 2006, Smell was complaining of worsening muscle aches. She said that her lower back was killing her and her ankles and feet were painful, especially in the morning when she felt unable to move for a period of time. On this day, she also had a dog bite on her finger which was infected. She was following with a gastroenterologist for her persistent nausea, and she was seeing a rheumatologist as well. On examination Smell appeared tired, anxious, and pale. Dr. Perelli reported diffuse tenderness with light palpation. Slight epigastric tenderness was present as well. Smell was given a tetanus shot for her healing puncture wound from the dog bite. For her gastroesophageal reflux disease ("GERD") and peptic ulcer disease ("PUD"), she was being followed by a gastroenterologist. She was to continue taking Nexium and Zelnorm. For her anxiety, she was to continued taking her medications. Prescriptions were given for Lunexta and Atarex for sleep and Cymbalta was continued. Tr. 254.

7. On August 28, 2006, Smell told Dr. Perelli that her

13

headaches persisted and she was taking about 6 Fiorinal a day. She was not eating well and was losing weight. She said that she was unable to work. At times, she was very tired. Dr. Perelli mentioned that Smell's chronic pain might be due to fibromyalgia. On examination, Smell appeared tired and pale. There were diffuse complaints of pain with light palpation to her upper back. Smell was to follow up for her nausea/GERD/anemia/recent GI bleed with her gastroenterologist. For anxiety, she was to keep taking Cymbalta and Clonazepam. Dr. Perelli noted that Smell was refusing counseling. For headaches, tapering of Fiorinal was discussed again. Smell had reduced her intake from 10-11 per day to 5-6 per day. Axert was continued. Smell was to continue under the care of the rheumatologist. Tr. 253.

8. Smell presented to Glenn Freed, D.O., in Pottsville, Pennsylvania on September 12, 2006. Dr. Freed states that he saw Smell during her June, 2006, hospitalization at which time she was anemic. This appears to have resolved with the use of iron and vitamin C. Dr. Freed decreased her dosage of iron and vitamin C and recommended that she take Nexium on an empty stomach daily. He hoped that this would eliminate the need for Zantax. Dr. Freed "returned" Smell to Dr. Perelli's care. Tr. 247.

9. On November 2, 2006, in a follow-up with Dr. Perelli, Smell still had headaches and there was no major change. She was generally taking more than 5 Fiorinal a day. She had many stressors at home with her husband. She reported being

unable to concentrate.  Reportedly, she was trying to find work but due to her pain, anxiety, and headaches, she was having difficulty even with her usual activities.  She was not sleeping well.  Her muscle aches were worse at times.  She was seeing her rheumatologist and was due to follow up with her gastroenterologist but those symptoms were not currently a problem.  On examination, Dr. Perelli observed that Smell had a dull affect. She appeared tired and pale. There was diffuse tenderness over her back, arms and legs.  Dr. Perelli discussed with Smell the possibility of a consultation with a neurologist for her recurrent headaches but Smell said that it did not help last time.  The doctor also mentioned the possibility that she was having rebound headaches from Fiorinal.  Tapering was discussed. Smell was to continue taking Avert which helped occasionally. For her anxiety and insomnia, she was to start Ambien and continue Clonazepan. At this time, Smell did not want to consider trying any selective serotin reuptake inhibitor medication except for the Cymbalta she was already taking.  She was to continue her current medications for her GERD and PUD and follow-up with her gastroenterologist.

    10.  On January 22, 2007, Smell presented to Dr. Perelli with worsening nausea and cramps for the past week.  She had many stressors recently and had not yet followed up with the gastroenterologist.  Dr. Perelli noted that Smell suffered from anxiety, PUD, GERD, chronic headaches, fibromyalgis, and a lupus-like syndrome.  Smell reported more anxiety and more muscle

aches. She was taking Vicodin prescribed by Dr. Brown but was "still feeling poorly." Reportedly, Smell's husband was verbally abusive. She felt unable to concentrate due to pain and anxiety but she was trying to find work. On examination, Smell appeared anxious and pale with a dull affect. There was epigastric tenderness as well as diffuse complaints of pain with light palpation. Dr. Perelli told Smell that she had to follow up with her gastroenterologist for her GERD/PUD. For her anxiety, counseling and psychiatric care were encouraged and the doctor gave Smell the telephone number for Women in Crisis. She was to continue Cymbalta. She was told not to take more than 5 Fiorinal a day for her headaches. Smell was to continue seeing her rheumatologist for her fibromyalgia/lupus-like syndrome. Tr. 251.

11. On May 9, 2007, Smell told Dr. Perelli that she still had a lot of issues at home. Her depression and anxiety were worsening. Her inability to concentrate persisted. She was experiencing nausea and epigastric pain but her headaches were not as bad. She reported that she could not concentrate enough to do even simple things at home. Her rheumatologist had added a medication but she could not remember what it was. On examination, Smell appeared tired and depressed. Dr. Perelli observed spasms in Smell's neck and low back. Epigastric pain was evident. Dr. Perelli reiterated the need for Smell to limit her Fiorinal use to a maximum of 5 per day to avoid rebound headaches. Smell refused counseling or additional medications for her anxiety and depression though she agreed to continue

Cymbalta and Clonazepam. She would follow up with Dr. Freed for her gastrointestinal issues and with rheumatologist Dr. Brown for her lupus. Tr. 250. Dr. Perelli reiterated that Smell needed to gradually stop Fioricet, but had not followed taper instructions over the last 2-3 years. Id.

12. On May 22, 2007, when Smell was seen in follow-up by rheumatologist Sylvan Brown, M.D., in Allentown,[17] Pennsylvania, her chief complaint was back pain. There was mild radiation but no significant sciatica-type symptoms. An injection in the right gluteal trigger point at her last visit was not significantly helpful though she was not feeling as bad. She was taking Percocet instead of her usual Vicodin and she reported that Lidoderm was not particularly helpful. There were no new complaints.

13. On July 3, 2007, in a follow-up with Dr. Brown, Smell was complaining of arthritis. Dr. Brown wrote "Lupus – possible fibromyalgia" and added that Smell was having increasing symptoms in multiple joints though her lumbar spine was better. Dr. Brown's assessment was systemic lupus erythematosus and fibromyalgia and increased Smell's Neurontin prescription, limited her to 2-3 Percocet a day and planned to add Plaquenil (if laboratory tests proved she was a candidate for it). Tr. 293.

14. On July 31, 2007, when Smell returned to Dr. Perelli, Smell was complaining of worsening pain. Her headaches

17. We did not find prior treatment notes from Dr. Brown in the administrative record.

persisted and she was taking more Fiorinal than she was supposed to. On examination she appeared tired and sad. There were spasms present throughout her neck and low back.

15. Smell had appointments with Dr. Brown on September 25 and November 20, 2007. At those appointments Smell complained of headaches and musculoskeletal pain.

16. On January 8, 2008, Mary Lawson, Psy.D., a psychologist, evaluated Smell on behalf of the Bureau of Disability Determination. Dr. Lawson's diagnosis was that Smell suffered from depression and generalized anxiety disorder and gave Smell a Global Assessment of Functioning (GAF) score of 48.[18] Dr. Lawson observed problems with Smell's concentration,

---

[18]. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty

persistence and pace. Tr. 304-305.

17. On January 18, 2008, Elizabeth Hoffman, Ph.D, a psychologist, reviewed Smell's medical records on behalf of the Bureau of Disability Determination and found that Smell had moderate difficulties in her ability to maintain concentration, persistence and pace. Tr. 313-325.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Smell has not engaged in substantial gainful work activity since April 30, 2006, the alleged disability onset date. Tr. 21.

At step two of the sequential evaluation process, the administrative law judge found that Smell has the following severe impairment: "systematic (sic) lupus erythematosus, fibromyalgia, depressive disorder, degenerative disc disease of the cervical spine and chronic headaches." Id.

At step three of the sequential evaluation process the administrative law judge found that Smell's impairments did not individually or in combination meet or equal a listed impairment. Tr. 22. However, as part of the step three analysis the administrative law judge found that Smell had moderate to marked difficulties with respect to concentration, persistence and pace. Tr. 22-23.

At step four of the sequential evaluation process the

_____

in social, occupational, or school functioning. Id.

19

administrative law judge found that Smell could not perform her prior relevant semiskilled, light to medium work but that she had the residual functional capacity to perform a limited range of sedentary work. Tr. 24.  The administrative law judge specifically found that Smell could perform sedentary work except Smell "is limited to jobs involving simple 1-2 steps, that she have the option to sit/stand at will, that she not be around hazardous machinery, heights or extreme temperatures, no fumes, odors or dust exposure, have occasional exposure to the public and must not climb, kneel or crawl." Id.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge found that Smell could perform work as a bench type assembler, packager and inspector, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 29.

The administrative record in this case is 512 pages in length, primarily consisting of medical and vocational records. Smell argues, inter alia, that the administrative law judge erred when presenting a hypothetical question to the vocational expert. Specifically, it is argued that the administrative law judge in his analysis at step three found that Smell had moderate to marked difficulties in concentration, persistence or pace but when presenting a hypothetical question to the vocational expert, the administrative law judge did not include that limitation in the question.

Smell argues that the failure to include that
limitation – a moderate to marked limitation in concentration,
persistence or pace – in the hypothetical question is an error
warranting remand for a new hearing.  We find substantial merit
in that argument.

Cases from this circuit and other circuits support
Smell's position. The Court of Appeals for the Third Circuit has
held that if an administrative law judge poses a hypothetical
question to a vocational expert that fails to reflect all of the
applicant's impairments that are supported by the record, the
vocational expert's opinion cannot be considered substantial
evidence. Ramirez v. Barnhart, 373 F.3d 546, 552-553 (3d Cir.
2004); see also Corona v. Barnhart, 431 F.Supp.2d 506, 516
(E.D.Pa. 2006)("the ALJ's determination that Plaintiff suffers
mild restrictions in activities of daily living, moderate
difficulties in maintaining social functioning and moderate
difficulties in maintaining concentration is not properly
reflected in her hypothetical question to the VE."); Warfle v.
Astrue, Civil No. 10-1255, slip op. at 20 (M.D. Pa. May 5,
2011)(Muir, J.)("It is incumbent on the administrative law judge
to include in a hypothetical question all the limitations that
are supported by the records."); Little v. Astrue, Civil No. 10-
1626, slip op. at 18-19 (M.D.Pa. September 14, 2011)(Kosik, J.).

Although the administrative law judge limited Smell to
unskilled work involving simple 1-2 steps, this does not

adequately reflect a moderate to marked limitation in concentration, persistence or pace. Id. There are clearly many unskilled jobs that require an employee to maintain concentration, persistence and pace. There is no evidence in the record from a vocational expert that a moderate to marked limitation in those areas would not impact Smell's ability to maintain employment as a bench type assembler, packager or inspector. We can only speculate as to what the erosion would have been if a marked or moderate limitation in concentration, persistence or pace would have been included in the hypothetical question.[19]

In addition to the error when questioning the vocational expert, the administrative law judge erred at step two of the sequential evaluation process.

Under the Social Security regulations, an administrative law judge considers whether there are any medically determinable impairments. The ALJ then considers symptoms of both medically determinable severe and non-severe impairments when setting a claimant's residual functional capacity. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §

_____

19. It is also important to mention that at step five of the sequential evaluation process the burden is on the Commissioner to produce evidence demonstrating that other work exists in significant numbers in the national economy that the applicant can perform. 20 C.F.R. §§ 404.1512 and 404.1560.

404.1520(c).  If a claimant has no impairment or combination of
impairments which significantly limit the claimant's physical or
mental abilities to perform basic work activities, the claimant
is "not disabled" and the evaluation process ends at step two.
Id.  If a claimant has any severe impairments, the evaluation
process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to
find a medical condition severe at step two will not render a
decision defective if some other medical condition was found
severe at step two.  However, all of the medically determinable
impairments both severe and non-severe must be considered at step
four when setting the residual functional capacity.  The social
security regulations mandate such consideration and this court
has repeatedly so indicated. See, e.g., Christenson v. Astrue,
Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir,
J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21
(M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil
No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27,
2011)(Caputo, J.); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923
and 416.945(a)(2).

     The record reveals that Smell suffered from a
generalized anxiety disorder in addition to depression.  Both Dr.
Lawson and Dr. Hoffman found that Smell suffered from a medically
determinable generalized anxiety disorder. The failure of the
administrative law judge to find that conditions as medically

determinable impairments, or to give an adequate explanation for discounting it, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Smell. The administrative law judge found Smell's medically determinable impairments could reasonably cause Smell's alleged symptoms but that Smell's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Smell's medically determinable impairments.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: November   19, 2012